[Civ. No. 7855.   Third Dist.   Mar. 19, 1951.]

ELGIN H. HOLMES et al., Respondents, v. THE GRANGE FRATERNAL FIRE INSURANCE ASSOCIATION OF CALIFORNIA, Appellant.

Busick & Busick and Charles O. Busick, Sr., for Appellant.

Bush & Ackley, David F. Bush and T. R. Vilas for Respondents.

ADAMS, P. J.—This action was brought by Elgin H. Holmes, Katherine Holmes Jenness and Lucebia Bennett to recover upon an insurance policy issued by defendant on or

about May 2, 1947. A verdict for plaintiffs was followed by a judgment from which this appeal was taken. The evidence shows that on May 31, 1946, plaintiff Elgin H. Holmes entered into an agreement with Lucebia Bennett to purchase from her certain real property situated near Sonora in Tuolumne County, for the sum of $8,500. A payment of $2,000 was made at that time and it was agreed that the balance should be paid in monthly installments thereafter, deed to be executed by seller upon receipt of $3,000, the unpaid balance to be secured by a deed of trust.

On February 24, 1947, Elgin H. Holmes was married to Katherine, now plaintiff Katherine Holmes Jenness. Shortly thereafter Holmes and his wife made application for membership in Sonora Grange No. 705, and on March 7, 1947, paid their initiation fees of $1.00 and took two of the four degrees conferred by that organization. They did not take the third and fourth degrees which were necessary to constitute them members of the Order of Patrons of Husbandry, and they did not pay any dues at that time.

Defendant was a fraternal fire insurance association authorized under the laws of this state to insure against loss by fire property belonging to members of Sonora Grange No. 705 who were eligible to insure therein.

On April 21, 1947, Elgin H. Holmes filed with John Tallent, a soliciting agent for Sonora Grange No. 705, an application for fire insurance on the property which he had contracted to purchase, and certain furnishings in the house thereon. In said application he represented that he was "a member of the Order of Patrons of Husbandry, in good standing, in Sonora Grange No. 705," and stated that he "owned" the property therein described. In answer to interrogatories set forth in said application it was recited that his title to the land was "deed of trust," that there was an encumbrance of $6,000 held by Mrs. Lucebia Bennett, and that the nature of the encumbrance was "mortgage"; that the premises were occupied by owner. It contained the following as well: "I hereby further warrant, covenant and agree with said Association that the foregoing is a full, just and true exposition of all facts and circumstances conditions, situation and value of property, so far as the same are known to me, and material to the risk; . . . I further agree to be governed by, and to abide by, the Articles of Incorporation and By-laws of said association now in force or hereafter enacted, and to pay all assessments made against me in accordance therewith."

The application was signed "Elgin H. Holmes," and no reference was made therein to Mrs. Holmes, nor did she sign the application. Attached to and made a part of such application was a statement of the provisions of law authorizing the organization of fraternal insurance associations and governing same. (See Deering's Gen. Laws, 1931 edition, p. 354, Act 688; also see Ins. Code, §§ 9080-9093.) A copy of the by-laws of the defendant fire association was attached. They provided that property belonging to patrons of husbandry was insurable with the association within specified limits. They also provided that any person becoming insured therein must comply with its rules, regulations and by-laws, must be and continue to be a patron of husbandry in good standing, must be the lawful owner of the property insured; and that his policy should become void if his dues to the grange became more than seven months in arrears. It was also provided that the association should not be bound by any act, statement or agreement made by its agent or solicitor unless the same was agreed to by the association by endorsement on the policy; that all conditions and stipulations printed on the face of the policy or application should be accepted as part of the rules and regulations of the association.

A policy of insurance was issued to Elgin H. Holmes and forwarded to him, but he did not receive it personally as he had departed for Guam. He did not, before his departure, become a patron of husbandry in Sonora Grange No. 705, or any other grange. He did not pay the premiums on the policy, nor did he pay any dues to the grange until June 4, 1948, after the fire, at which time he was over a year in arrears. The policy issued to him contained the same matter which was made a part of the application, and on the first page thereof it was stated: "The By-Laws of this Association are to be resorted to and used to explain the rights and obligations of the parties hereto in all cases not herein otherwise especially provided for, and are hereby made a part of this policy. This policy is made and accepted upon the above express condition." The application was also made a part of the policy by reference.

On April 28, 1947, Mrs. Holmes recorded a declaration of homestead on the property described in the insurance policy, in the affidavit attached to which she stated that she was the owner of the property described in the declaration. On or about May 8, 1947, she filed in Tuolumne County an action

for divorce from Holmes, in which she asserted that there was no community property. About that time, and before May 15, 1947, she called upon agent Tallent regarding the insurance, saying that Mr. Holmes had left and had not paid the premium. Tallent suggested that the policy be changed to her name. Tallent then wrote the following letter to the appellant insurance company: ''Inclosed find another application for insurance and returning the policy for the Elgin Holmes, this party brought the policy to me to have changed, it seems the insurance should have been made out to Mrs. Elgin Holmes,—(as she pays the bills) and the check is made out in her former name, by her, so if that is satisfactory then you can return the policy to Elgin Holmes, Route 2, Sonora. Hope it is okey.''

However, no new application was made. The secretary of the association changed the name on the face of the policy by inserting ''Mrs.'' in front of the name ''Elgin H. Holmes,'' wherever it appeared, and returned the policy after attaching a ''Correction of Name of Assured'' which recited: ''It being understood that title to the property insured under the above policy is vested in the name of Mrs. Elgin H. Holmes, the name said Mrs. Elgin H. Holmes is hereby recognized as the sole insured under the terms and conditions of this policy.'' Mrs. Holmes issued a check to pay the premium, and Tallent forwarded the check to the insurance company. Mrs. Holmes was not, at that time, a patron of husbandry, and she did not take the third and fourth degrees and become such until April 16, 1948, just shortly before the fire which destroyed the house and contents on May 26, 1948.

In the meantime Mrs. Holmes had filed a complaint for divorce in Nevada, and a decree was granted November 22, 1948. A property settlement was executed by the parties dated October 8, 1948, which recited that Mrs. Holmes had executed to her husband a quitclaim deed to the property formerly occupied by them and that she transferred to him all her interest in any personal property. She agreed to sign a relinquishment of all her interest in the insurance policy on the property destroyed by fire so that the husband might collect the full amount due thereunder.

Appellant's first contention is that the verdict is not supported by the evidence since it is uncontradicted that Elgin Holmes was not a patron of husbandry and that he became more than seven months in arrears in the payment of dues to the grange, wherefore the policy, if ever valid, was rendered

void; that no valid policy was ever issued to Mrs. Holmes because when the policy was changed she was not a patron of husbandry, and that she had no insurable interest in the property insured; also that the policy had been changed to her name upon the understanding that the policy should have been issued to her originally and that she was the owner of the property; and that her interest, if any, was never represented to the association or described correctly, though the policy provided: "Any false representation by the insured of the conditions, situation or occupancy of the property or otherwise, or any omission to make known any fact material to the risk, or an over valuation, or any misrepresentation whatsoever, either in written application or otherwise, shall render this policy void and of no effect . . . or if the interest of the insured in the property, whether as owner, trustee, consignee, factor, mortgagee or otherwise, if the interest of the insured be any other than the entire, absolute, unconditional and sole ownership of the property, both at law and in equity, it must be so represented to the Association, and so expressed in the written portion of this policy, and such interest correctly described, otherwise this Association shall not be liable by virtue of this policy."

Regarding fraternal fire insurance, section 9085 of the Insurance Code provides: "A risk shall not be written by such association except for members in good standing on the books of the society forming the association. A suspension or withdrawal from membership in such society shall suspend the insurance until the member is restored to good standing in society and association. A restoration to membership after suspension therefrom shall not extend the term of the insurance." Section 9089 of said code contains the provision that such association may make such by-laws, not inconsistent with the laws of this state, as are necessary for its government and for the transaction of its business; and section 9092 provides that persons insuring property with the association shall, at the time of effecting the insurance, pay such charges as are required by the rules or by-laws of the association.

The by-laws of defendant association, which, as aforesaid, constituted a part of the policy sued upon, provided that any person becoming insured therein must comply with the rules, regulations and by-laws, and must be, and continue to be, a patron of husbandry in good standing.

The evidence shows, without conflict, that Elgin Holmes was not a patron of husbandry, that he did not pay any

dues to the grange until after the fire, and that at the time the property was destroyed he was over seven months in arrears; and that Mrs. Holmes was not a patron of husbandry when the name on the policy was changed, and that she was not the owner of the property.

The by-laws also provided that a member of the association should cease to be such if his dues became more than seven months in arrears. We conclude, therefore, that Elgin H. Holmes was not eligible to insure the property at the time the policy was issued, and even if he had been he would have ceased to be when his dues became over seven months in arrears. Respondents, in their opening brief, in effect concede this to be true. Their claim is that the policy runs to Mrs. Holmes. As originally written, the policy alleged that Katherine and Elgin Holmes were husband and wife living in the house insured, but no interest of said wife in the real property was alleged. It did not purport to insure the wife against loss, but only Elgin H. Holmes. It was never assigned to Mrs. Holmes. The changes were made without the knowledge or consent of Elgin H. Holmes, and no change in the ownership of the property was effected. At the trial Katherine attempted to show that she was part owner, by testifying that she had put money into the purchase price; but when this was done was not shown, and there is no evidence that she had put any money into it before the policy was issued. She gave no testimony as to any ownership of the personal property except to say that it belonged *either* to her or to Mr. Holmes; and the agreement to purchase from Mrs. Bennett was made before the marriage and the contract was entered into by Elgin alone.

The fact that the property constituted her home at the time the policy was issued would not, of course, affect the title of her husband who, before their marriage, and when, as she testified, they were ''engaged,'' had contracted to buy it in his own name. She testified that she ''was induced to invest her separate funds in the maintenance and operation of said *ranch* . . . upon the express promise'' of Holmes to reimburse her. Holmes at the trial testified that he was the owner of the property but stated that he claimed Mrs. Jenness had an interest in the ranch because of money she ''loaned'' him. There is no evidence that her funds were expended upon the *house, except* that she testified that after the issuance of the policy she had it painted, the roof repaired, and the founda-

tion enclosed. How this was paid for does not appear. The complaint fails to allege any interest of Katherine in the house.

The fact that Katherine became the wife of Elgin after the contract was made with Mrs. Bennett did not give her any interest in the property. ■ If it was separate property of Elgin before the marriage it presumably continued to be such. (*In re Miller*, 31 Cal.2d 191, 197 [187 P.2d 722]; *Boyd v. Oser*, 23 Cal.2d 613, 621 [145 P.2d 312]; *Palen v. Palen*, 28 Cal.App.2d 602, 604 [83 P.2d 36].)

■ The filing of the declaration of homestead gave Katherine no title or interest in the property. This court said, in *Arighi v. Rule & Sons, Inc.*, 41 Cal.App.2d 852, 855 [107 P.2d 970], that "a homestead right is not an estate in the *land*, but a mere *privilege* of exemption from execution of such estate as the holder occupies." Also see *Snodgrass v. Parks*, 79 Cal. 55, 58 [21 P. 429]; *Smith v. Bangham*, 156 Cal. 359, 366 [104 P. 689, 28 L.R.A.N.S. 522]; *Jacobson v. Pope & Talbot*, 214 Cal. 758, 762 [7 P.2d 1017]; *In re Rauer's Collection Co.*, 87 Cal.App.2d 248, 261-262 [196 P.2d 803]; *Alexander v. Jackson*, 3 Cal.Unrep. 344, 349 [25 P. 415].

Section 9080 of the Insurance Code at the time this policy was issued provided that except as provided in chapter 7, which is entitled Fraternal Fire Insurers, an association organized and operating thereunder is not governed by the insurance code or other insurance laws of the state. Section 9081 specifies who may form insurer associations, under which members bind themselves to contribute to each other's losses by fire. Section 9085 provides that a risk shall not be written by such association except for members in good standing on the books of the society forming the association. Section 9089 authorizes such association to make such by-laws, not inconsistent with the laws of this state, as are necessary for its government and the transaction of its business. Sections 9090-9092 provide that the members of such an association mutually agree to participate in each other's fire losses, and to pay their share of the losses and expenses of operation during the life of their policies; and that, at the time of effecting insurance, applicants shall pay such charges as are required by the rules or by-laws of the association.

From the foregoing it is obvious that fire losses of members can be paid only by assessments levied upon the members; and there seems to be ample authority to the effect that no valid assessment for such a purpose can be imposed unless

there has been compliance with the prerequisite conditions. It is said in 3 Couch on Insurance, section 595a, page 1910: "An assessment cannot be validly made unless the necessity therefor properly and legally arises within the contemplation of the contract therefor, since it is upon such conditions that the members have promised to contribute. In fact, not only must every prerequisite to its validity be complied with, but it must be made for a proper purpose; otherwise payment thereof cannot be enforced. In other words, the facts must be such as to occasion a legal necessity for the making of an assessment, since the contract is a conditional promise to pay, being premised upon certain contingencies in the nature of conditions precedent which must exist; otherwise, an assessment will have no validity, and will be unenforceable."

In 2 Cooley's Briefs on Insurance, pages 1678-1679, we find: "The liability of members of mutual benefit associations to assessments depends largely on the construction of the particular contract. The right to assess is to be strictly construed, and can be exercised only when the conditions prescribed in the contract exist (*Wayland* v. *Western Life Indemnity Co.,* 166 Mo.App. 221 [148 S.W. 626])." And it is stated in 3 Joyce on Insurance, section 1271, page 2404: "The fact that regular members of a mutual insurance company have received the benefits of their insurance does not estop them to deny their liability to assessments for losses on policies issued to nonmembers."

We conclude that since neither Elgin Holmes nor his wife was eligible for insurance with appellant, the policy sued upon never became effective, and that none of the plaintiffs is entitled to recover thereon.

Appellant, in addition to the foregoing, urges that in the application for the policy Holmes misrepresented the terms of his agreement with Mrs. Bennett; and that there were errors in the instructions given and in the refusal of others; but since we have concluded that the policy never became effective for the reasons heretofore stated, it is unnecessary to consider other contentions.

Respondents urge that appellant has never paid back or offered to return the premium which it received from Mrs. Holmes, to wit, $33.60. There was no request in the complaint for return of premium, nor any waiver or estoppel pleaded. It was said in *Goorberg* v. *Western Assurance Co.,* 150 Cal. 510, at page 519 [89 P. 130, 119 Am.St.Rep. 246, 11 Ann.Cas. 801, 10 L.R.A.N.S. 876]: "Furthermore, the retention of the

premium was not pleaded by the plaintiff. His complaint showed affirmatively that there had been a breach of warranty as to title, and to overcome this he was obliged to allege facts showing a waiver or estoppel. He met this requirement by alleging the issuance of the policy by the defendant after notice of the defect of title, but this did not put in issue any waiver or estoppel that might have been created by other facts. If the plaintiff relies on waiver or estoppel as to any defense which would otherwise be available to the defendant under the facts stated in the complaint, the facts constituting such waiver or estoppel must be pleaded in the first instance. (19 Cyc. 923; *Gillon* v. *Northern Assurance Co.,* 127 Cal. 480, [59 P. 901]; *Vernon Ins. and T. Co.* v. *Maitlen,* 158 Ind. 393, [63 N.E. 755]; *Bruce* v. *German S. and L. Soc.,* 24 Or. 486, [34 P. 16]; *McCoy* v. *Iowa State Ins. Co.,* 107 Iowa, 80, [77 N.W. 529].)''

The judgment is reversed.

Peek, J., and Van Dyke, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied May 17, 1951.